1  ANDRÉ BIROTTE JR.
   United States Attorney
2  ROBERT E. DUGDALE
   Assistant United States Attorney
3  Chief, Criminal Division
   WENDY T. WU (Cal. State Bar No. 242075)
4  Assistant United States Attorney
   Cyber & Intellectual Property Crimes Section
5  1200 United States Courthouse
   312 North Spring Street
6  Los Angeles, California 90012
   Telephone: (213) 894-0619
7  Facsimile: (213) 894-0141
   E-mail:   Wendy.Wu@usdoj.gov
8
   Attorneys for Plaintiff
9  UNITED STATES OF AMERICA

10          UNITED STATES DISTRICT COURT

11        FOR THE CENTRAL DISTRICT OF CALIFORNIA

12  UNITED STATES OF            )  No. CR 11-1175-SJO
    AMERICA,                    )
13                              )  GOVERNMENT'S OPPOSITION TO
            Plaintiff,          )  DEFENDANT'S MOTION TO SUPPRESS
14                              )  COERCED CONFESSION AND MOTION
         v.                     )  TO DISMISS COUNT 15;
15                              )  MEMORANDUM OF POINTS AND
    TYLER SCHRIER,              )  AUTHORITIES; DECLARATIONS OF
16  KEITH JAMES HUDSON, and     )  TANITH ROGERS, KENNETH KELLER,
    RYDER FINNEY,               )  STEPHEN L. NEY, AND MICHAEL
17                              )  PAPPALARDO; EXHIBITS
            Defendants,         )
18                              )  Hearing Date: May 31, 2012
                                )  Hearing Time: 9:00 a.m.
19                              )
                                )  Courtroom of the Honorable
20  _____    )  S. James Otero

21

22        Plaintiff United States of America, by and through its counsel of record,

23  hereby submits its opposition to the Motion to Suppress Coerced Confession and

24  Motion to Dismiss Count 15, filed by defendant Tyler Schrier ("Def. Mtn."). This

25  opposition is based on the attached memorandum of points and authorities, the

26  declarations of Tanith Rogers, Kenneth Keller, Stephen L. Ney, and Michael

27  ///

28

Pappalardo, the files and records of this case, and any additional argument and evidence presented at the hearing.

Dated: March 30, 2012                    Respectfully submitted,

                                         ANDRÉ BIROTTE JR.
                                         United States Attorney

                                         ROBERT E. DUGDALE
                                         Assistant United States Attorney
                                         Chief, Criminal Division


                                          /s/
                                         WENDY T. WU
                                         Assistant United States Attorney

                                         Attorneys for Plaintiff
                                         UNITED STATES OF AMERICA

# TABLE OF CONTENTS

**PAGE(S)**

TABLE OF AUTHORITIES.................................................... iii

I.     INTRODUCTION.................................................... 1

II.    STATEMENT OF FACTS............................................ 1

    A.     The Offense Conduct. ..................................... 1

        1.     Extortion of Victim J.S.. ............................ 1

        2.     Extortion of Victim A.L.. ........................... 2

        2.     Extortion of Victim D.N. ............................ 2

    B.     Search Warrant........................................... 3

    C.     Search of Defendant's Residence............................ 3

    D.     Interview of Defendant.................................... 6

    E.     Search of Defendant's Residence Reveals He Lied to Agents During His Interview. .................................... 12

III.   ARGUMENT. ..................................................... 13

    A.     Defendant Was Not In Custody During His Interview. ............................................... 13

    B.     Defendant's Statements Were Voluntary And Therefore Should Not Be Suppressed. ...................... 14

        1.     There Was No Psychological Coercion Because There Was No Express Or Implied Threat That Defendant Would be Expelled from Trinity College If He Refused To Answer the FBI's Questions. ........................................ 15

        2.     SA Rogers Advised Defendant of His Miranda Rights ............................................. 18

        3.     The Remaining Factors And Totality Of The Circumstances Demonstrate That Defendant's Statements Were Voluntary. .......................... 19

    C.     Even If The Court Finds That Defendant Was In Custody During The Interview, Defendant's Statements Should Not Be Suppressed Because Defendant Waived His Miranda Rights. ..................... 20

D.      Defendant's Motion to Dismiss Count 15 Should
        be Denied. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

IV.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

# TABLE OF AUTHORITIES

**CASES**                                                            **PAGE(S)**

Clark v. Murphy,
    331 F.3d 1062 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20

Jenner v. Smith,
    982 F.2d 329 (8th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209

Lego v. Twomey,
    404 U.S. 477 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Martin v. Wainwright,
    770 F.2d 918 (11th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Minnesota v. Murphy,
    465 U.S. 420 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

Miranda v. Arizona,
    384 U.S. 436 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Moran v. Burbine,
    475 U.S. 412 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Oregon v. Bradshaw,
    462 U.S. 1039 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Schneckloth v. Bustamonte,
    412 U.S. 218 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. Bassignani,
    575 F.3d 879 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

United States v. Beraun-Panez,
    812 F.2d 578 (9th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Frank,
    956 F.2d 872 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

United States v. Garibay,
    143 F.3d 534 (9th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

United States v. Haswood,
    350 F.3d 1024 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. Hayden,
    260 F.3d 1062 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Kim,
    292 F.3d 969 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

iii

# TABLE OF AUTHORITIES

**Page(s)**

United States v. Labrada-Bustamante,
    428 F.3d 1252 (9th Cir. 2005)...................................... 21

United States v. Leon Guerrero,
    847 F.2d 1363 (9th Cir. 1988)...................................... 15

United States v. Miller,
    984 F.2d 1028 (9th Cir. 1983)...................................... 15

United States v. Shi,
    525 F.3d 709 (9th Cir. 2008)....................................... 21

**FEDERAL STATUTES**

18 U.S.C. § 371.............................................................. 1

18 U.S.C. § 1001(a)(2). ............................................... 1, 22

18 U.S.C. §§ 1030(a)(2)(c), (c)(2)(B)(i), (c)(2)(B)(ii). ...................... 1

18 U.S.C. §§ 1030(a)(7)(B), (c)(3)(A). ................................... 1

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

Defendant Tyler Schrier ("defendant") is charged with 14 counts of the 15-count indictment for violations of 18 U.S.C. § 371: Conspiracy; 18 U.S.C. §§ 1030(a)(7)(B), (c)(3)(A): Extortion by Threat to Impair Confidentiality of Information From a Protected Computer; 18 U.S.C. §§ 1030(a)(2)(C), (c)(2)(B)(i), (c)(2)(B)(ii): Unauthorized Access to a Protected Computer to Obtain Information; and 18 U.S.C. § 1001(a)(2): False Statement to Law Enforcement (Count 15).  The charges stem from defendant's participation with co-defendants Keith James Hudson ("Hudson") and Ryder Finney ("Finney") in a conspiracy to hack into victim J.S.'s email, obtain nude photos of J.S. and victim A.L. from J.S.'s email account, and extort victims J.S., A.L., and D.N. for money by threatening to release the nude photos.

Defendant seeks to suppress the statements he made on November 10, 2010, to Federal Bureau of Investigation ("FBI") Special Agents Tanith Rogers and Karlene Clapp during a non-custodial, <u>Mirandized</u> interview.  Defendant further moves to dismiss Count 15 of the indictment.  As set forth below, defendant's motion should be denied.

## II.  STATEMENT OF FACTS

**A.  The Offense Conduct**

1.  <u>Extortion of Victim J.S.</u>

On October 17, 2010, victim J.S.'s email account was hacked from IP address 157.252.147.97, later identified as assigned to  defendant, who was a student at Trinity College in Connecticut.  Declaration of Tanith Rogers ("Rogers Decl."), ¶¶ 5-6.  On October 18, 2010, victim J.S.'s account again was hacked from IP addresses 157.252.149.10 (later identified as assigned to defendant's roommate, Kevin Polanco, at Trinity College) and 71.146.159.55, later identified as belonging to co-defendant Hudson.  <u>Id.</u>

1

Defendant then sent an email from his stankylaggg@gmail.com account to victim J.S., who is a professional poker player, informing J.S. that defendant had nude photos of J.S. and J.S.'s then-girlfriend, A.L., and sexually explicit messages between J.S. with other women. Id., ¶ 7. Later that same night, defendant contacted J.S. via AOL Instant Messenger ("AIM") using the screen name "just4kicksbrah" and demanded $100,000. During the AIM chat, defendant admitted several times that he was "blackmailing" J.S. For example:

> seebs [victim J.S.'s AIM ID]: *i don't know, man. you are blackmailing me. i'ma pay you, but that's a felony crime, bro.*
>
> just4kicksbrah: *O I thought u were just buying something from me.*
>
> seebs: *you are telling me you broke into my personal stuff and you aren [sic] going to post the pics if i don't pay you. I'm gonna pay you, but that's blackmailing fo sho.*
>
> just4kickbrah: *Fo sho...*

Id.

In a series of AIM chats between October 18 and October 22, 2010, defendant continued to extort J.S. Defendant threatened to post the nude photographs if J.S. told anyone about the blackmail. Id., ¶ 7.d.

2.    Extortion of Victim A.L.

From October 21, 2010, through November 8, 2010, defendant emailed victim A.L. from the stankylaggg@gmail.com account and threatened to post her nude photos on the internet unless A.L. paid money to defendant. During this period, defendant emailed victim A.L. more than 100 times, demanding various payment amounts, including one demand of $1,000,000. Defendant also instructed A.L. to send money to his online poker account under the screen name "Craigslist girl" on the Full Tilt poker website. Id., ¶ 9.

3.    Extortion of Victim D.N.

From October 26, 2010, through November 8, 2010, defendant also emailed victim D.N., another well-known professional poker player who had been dating

2

victim A.L., via defendant's stankylagg@gmail.com account, and demanded up to $110,000 in exchange for not releasing nude photos of A.L. In numerous emails, defendant asked for the money to be transferred to various online poker accounts, including "Craigslist girl," "Marissa_20" (later identified as belonging to co-defendant Hudson), and "Skittl3zzz" (later identified as belonging to co-defendant Finney). Id., ¶ 8.

**B.    Search Warrant**

On November 9, 2010, FBI SA Kenneth Keller met with Trinity College's Director of Campus Safety, Charles Morris, to provide him with courtesy notice of the FBI's intention to execute a search warrant at defendant's residence, which was located on Trinity College's campus. See Declaration of Kenneth Keller ("Keller Decl."), ¶ 3. Mr. Morris informed SA Keller that he had an obligation to tell the Trinity College leadership about the FBI's intention to execute a search warrant at defendant's residence and would also notify the Assistant Director of Campus Safety, Christopher Lyons. Id. During the meeting, SA Keller and Mr. Morris discussed, among other things, that in consideration of the fact that defendant's residence was located in a dormitory on the college campus, the agents would not display the FBI insignia on their clothing until they were inside defendant's residence so as not to disturb or frighten the students. Keller Decl., ¶ 4. During this meeting Mr. Morris confirmed the location of defendant's residence. Id.

On that same day, the Honorable Donna F. Martinez, United States Magistrate Judge for the U.S. District Court for the District of Connecticut, issued a search warrant for defendant's residence at Trinity College. See Id., ¶ 4. The search warrant was based on an affidavit describing the hacking and extortions described above in subsections (A)-(C). Id., Ex. A.

**C.    Search of Defendant's Residence**

On November 10, 2010, at approximately 5:45 a.m., SA Rogers and SA Clapp met with other FBI agents at Trinity College's Campus Safety Office for a

3

briefing before the execution of the search warrant.  Id., ¶ 12.  Mr. Morris, Mr. Lyon, and the Associate Dean of Trinity College were also present during this meeting.  Keller Decl., ¶ 5.  SA Rogers and SA Keller provided general details about the investigation to the agents.  Id.  SA Keller also assigned roles and responsibilities to the agents during the search, reviewed with the agents the warrant, including the items to be seized, and the FBI's standardized policy and procedures with respect to search warrants.  Id.  SA Keller instructed the agents to wear a jacket to cover the FBI insignia on their clothing before entering defendant's dormitory building.  See Declaration of Stephen Ney ("Ney Decl."), ¶ 4.  Accordingly, the agents were mindful of toning down the FBI's presence on campus so as not to disturb the students.  Id.  This meeting lasted approximately 20 minutes.  Keller Decl., ¶ 5.

After the meeting, the agents went to their respective vehicles, put on jackets and protective gear, and drove to defendant's residence.  Keller Decl., ¶ 6.  SA Rogers was assigned to cover the perimeter, specifically, the back parking lot of defendant's dormitory building.  Rogers Decl., ¶ 13.  At approximately 6:25 a.m., SA Keller knocked on the door of defendant's residence and announced the FBI's presence and its intention to execute a search warrant.  Keller Decl., ¶ 6.  After a second knock and announce and hearing no response from inside defendant's residence, a Trinity Campus Security officer opened the front door to defendant's residence and let the agents in.  Ney Decl., ¶ 5.  Given the dormitory setting, and the fact that defendant did not appear to have any violent history, the FBI previously had decided that the agents would not draw their weapons upon entering defendant's residence.  Ney Decl., ¶ 6.

Upon entry, pursuant to the FBI's standard procedure, the agents moved swiftly to conduct a protective sweep of the residence before beginning the search.  Keller Decl., ¶ 7.  SA Stephen Ney followed another agent into the room previously identified as defendant's bedroom.  Ney Decl., ¶ 6. Once inside

defendant's bedroom, SA Ney saw, among other things, one set of bunk beds and one single bed.  Id.  He also observed that defendant's room was very messy with large piles of dirty laundry.  See Exhibit C attached to the Declaration of Michael Pappalardo ("Pappalardo Decl.").  SA Ney saw that defendant was in the bed on the left side of the room.  Ney Decl., ¶ 8.  SA Ney announced in a commanding voice, in effect, this was an FBI search warrant and told defendant to get out of the bed.  Id.  SA Ney did not yell or scream at defendant.  Defendant got out of his bed and was escorted into the living room.  Ney Decl., ¶ 9.

After the protective sweep was completed, an agent escorted defendant into his bedroom to get clothes.  Ney Decl., ¶ 10.  Defendant then returned to the living room dressed in a hooded sweatshirt and jeans.  Id.  None of the agents told defendant that he could put on a pair of short pants or any other specific article of clothing.  Ney Decl., ¶ 11.  None of the agents spoke to defendant in a loud voice or ordered defendant not to talk.  Id.

SA Rogers, who had been covering the back parking lot of the building, received the "all clear" signal after the protective sweep was completed.  Rogers Decl., ¶ 14.  SA Rogers and SA Clapp went into defendant's residence to see whether defendant had been located, and saw defendant and his roommate in defendant's residence.  Id.  The agents then returned to their car, which was parked right outside the building, to remove their bulletproof vests and retrieve notepads for the interview.  The agents then returned to defendant's residence to interview defendant and his roommates.  Id.

Meanwhile, SA Michael Pappalardo took "entry" and "exit" photographs of defendant's residence, including defendant's bedroom, to capture the condition of each room before and after the search.  See Pappalardo Decl., ¶¶ 4-5, Ex. E.  In particular, SA Pappalardo took a picture of the living room approximately 15 to 20 minutes after agents entered defendant's residence.  Pappalardo Decl., ¶ 6, Ex. D. By this time, defendant was sitting in the living room dressed in a sweatshirt and

5

jeans.  Id.

After SA Pappalardo took the entry photographs, SA Ney and a task force officer ("TFO") searched defendant's bedroom in accordance with FBI standardized procedures.  Ney Decl., ¶ 12.  While searching defendant's bedroom, SA Ney found, among other things, Best Buy receipts indicating a recent purchase of a computer, and check receipts for approximately $2,500 in the name of another individual, Aaron Salloway.  Ney Decl., ¶ 13.  SA Ney also found digital devices, including an Apple MacBook Air computer on defendant's bed and an iPhone, which were seized pursuant to the search warrant.  Id.  Neither SA Ney nor the TFO tore defendant's bed apart or strewn papers across the floor during the search.  Id.

**D.    Interview of Defendant**

At approximately 7:23 a.m., SA Rogers began interviewing defendant and recorded the interview.  Rogers Decl., ¶ 15.  SA Rogers initially considered interviewing defendant in his dorm room, however, the agents were still in the process of searching defendant's bedroom.  Id.  SA Rogers therefore asked defendant to go into the hallway and informed him that they could go back into defendant's bedroom after the agents had completed the search.  Id., Ex. B at 1, Ex. D at 0:00-1:15.

SA Rogers accompanied defendant to a stairwell at the west end of the hallway and conducted the interview on the landing of the stairwell.  Id., ¶ 16.  At each end of the hallway, there was a door that separated the stairwell from the main hallway, which created a private space in which to conduct the interview.  See id., Ex. C.  There were agents stationed at bottom and top of each stairwell to ensure no one would approach or interrupt the interview and for safety purposes.  Trinity College did not identify or make available to the agents private rooms in which to conduct interviews.  Id., ¶ 16.

SA Rogers introduced herself to defendant and orally advised him of his

6

Miranda rights.  Id., ¶ 17.  SA Rogers told defendant that he was not in custody and the FBI did not intend to arrest him.  She explained that the FBI was searching defendant's property, that she would like to speak with defendant, but he could leave and did not have to talk to the FBI if he did not want to.  See id.; Ex. B at 1-2; Ex. D at 1:21-2:10.  Defendant stated "ok" three times, appeared to understand the agent's advisement, and did not indicate he had any questions.  He consented to be interviewed without an attorney being present.  Id., ¶ 17.

During the interview, SA Rogers told defendant more than once that he did not have to talk to the FBI.  Id., ¶ 18.  At no point did SA Rogers tell defendant in any way that he would have to agree to the interview to avoid being expelled from Trinity College.  Id.  The agent did not demand that defendant speak with the FBI and did not tell defendant he was going to jail.  Id.

SA Rogers and SA Clapp maintained a friendly and casual tone throughout the interview.  See id., ¶ 40.  Defendant did not refuse to answer questions, did not indicate that he wanted to stop the questioning at any time, and did not state he wanted an attorney.  Defendant was never handcuffed or restrained by the FBI in any way and the agents did not draw their weapon or otherwise threaten defendant.  On that day, SA Rogers and SA Clapp wore business suits with their weapons concealed.  See id., ¶ 41.  During the interview, SA Rogers offered defendant a glass of water, which defendant accepted.  Id., ¶ 40; Ex. B at 10-12; Ex. D at 13:10-13:14, 15:15-15:30.

When SA Rogers asked about a business defendant and co-defendant Hudson tried to start together, defendant initially stated he was not aware of the business, but then admitted that he and Hudson had a poker-related website that had failed a couple of months before.  Id., ¶19; Ex. B at 2-4; Ex. D at 3:18-5:00.

SA Rogers asked defendant how he obtained victim J.S.'s email password.  Defendant denied getting J.S.'s email password, and claimed that Hudson had given that to him.  Id., ¶20; Ex. B at 4-5; Ex. D at 5:18-6:07.  Defendant also

claimed that Hudson was the one who accessed and obtained pictures from J.S.'s account, and that Hudson told defendant to log into J.S.'s account to see the pictures.  Id., ¶20; Ex. B at 5-6; Ex. D at 6:41-7:00, 7:55-8:20.  Defendant further claimed that Hudson had planned to make the victims pay for the pictures, and defendant had told Hudson it was a bad idea.  Id., ¶20; Ex. B at 8; Ex. D at 9:55-10:10.

With respect to defendant's Instant Messenger username "just4kicksbrah," defendant initially stated that he did not remember that username, (see Rogers Decl., ¶21; Ex. B at 9; Ex. D at 10:58-11:46), but later admitted that he created the "just4kicksbrah" account to contact the victims.  Id., ¶21; Ex. B at 12-13; Ex. D at 14:37-15:02, 17:25-17:32.  Defendant stated that Hudson had instructed defendant to contact the victims regarding the photographs, and further claimed that defendant had told Hudson that defendant did not want to do it and that it was "against the law and all that stuff."  Id., ¶22; Ex. B at 10; Ex. D at 12:30-13:00.

Defendant admitted that he emailed victim J.S. via defendant's "stankylaggg@gmail.com" account (see Rogers Decl., ¶ 23; Ex. B at 13; Ex. D at 16:30-16:57), and further admitted that he had contacted victims A.L. and D.N., but continually maintained that Hudson had told him to do so.  Id., ¶ 23; Ex. B at 15-16; Ex. D at 18:45-19:02, 20:08-20:46.

Defendant admitted that he emailed the nude photo of victim J.S. to J.S.'s friends, and claimed that Hudson had given him J.S.'s friends' email addresses and told him to send the photo. Id., ¶ 24; Ex. B at 17; Ex. D at 21:00-21:39.

Defendant also admitted that he created the online poker account under the screen name of "Craigslist girl" on the Full Tilt poker website.  Id., ¶ 25; Ex. B at 20; Ex. D at 24:50-25:07.  When asked about other accounts that were associated with the "Craigslist girl" account, including account "eightsixtyfour," defendant initially stated that he did not create those accounts, but then admitted that he played with the "eightsixtyfour" account.  Id., ¶ 25; Ex. B at 20-21; Ex. D at

8

25:33-25:16.

SA Rogers asked defendant about an online poker account under the screen name of something to the effect of "skittles." Defendant denied knowing who created that account, claiming it was "someone that Keith [Hudson] knows." Id., ¶ 26; Ex. B at 23; Ex. D at 28:50-29:00. Defendant stated that victim D.N. was supposed to send $100,000 into this account. Id., ¶ 27; Ex. B at 26; Ex. D at 31:50-31:59. Defendant further stated, "I mean I wasn't really extorting. I wasn't supposed to get any money." Id., ¶ 27; Ex. B at 28; Ex. D at 33:20-33:35. Defendant repeatedly stated that he was not planning to receive any money from the extortion. Id., ¶ 27; Ex. B at 28-29; Ex. D at 33:47-34:35.

During the interview, defendant stated that he did not want to get in trouble with his school. SA Clapp, who had joined SA Rogers after she finished interviewing defendant's roommates, responded that the decision would be up to the school. Id., ¶ 28; Ex. B at 32; Ex. D at 38:07-38:28. SA Clapp further stated that the FBI could tell the school that defendant was being cooperative, but the FBI does not have the final say as to the school's decisions concerning defendant. Id.

When SA Rogers asked defendant how he obtained information for victim S.C., who was identified during this investigation as the victim of a separate computer intrusion scheme involving defendant, defendant asked for a minute to collect himself. SA Rogers observed that defendant appeared to have realized the seriousness of the situation. SA Rogers responded, "Of course. I understand. You ok? You need water? Don't pass out on me, you're on the ledge." Id., ¶ 29; Ex. B at 33; Ex. D at 39:33-40:10. Defendant did not appear be ill or have any physical discomfort. Defendant expressed his concern about being thrown out of Trinity College. SA Rogers responded:

> I didn't say anything about going now. You know what I mean? Like the school seems really um good. You know they have been very cooperative. You know they want to keep it just as quiet as possible

9

and that is why we didn't you know bust in a door with guns blaring. You know because we are trying to keep it keep it chill. Um you I don't think you're looking a million steps ahead. You know. I don't know if that is necessary so you know that they know right now that you're being really cooperative and it'll get it worked out. I think that is as far as they have thought it through and has far as we have thought it through. So, one step at a time and you know you seem like a good kid and you have been cooperative. So you know I'm gonna do what we can to help. I think you know with the FBI tells the school that you were a great value to them I would guess. We obviously don't have the final say in that but you don't seem like a bad kid. So you have been honest with us thus far and you kind of freaked out now because you realized that we know more than just the extortion portion of it. Lots of credit cards involved as well. But again I don't think you're the mastermind behind all of this so let's work that out. Let's prove that.

Id., ¶ 30; Ex. B at 33-34; Ex. D at 40:15-41:30.

Defendant repeated that he did not want to get in trouble at school. SA Rogers responded that the school would do whatever is within its policy. Id., ¶ 36; Ex. B at 51; Ex. D at 01:02:00-01:02:15. When defendant asked whether the FBI intended to press charges against him, SA Rogers responded as follows:

TR (SA Rogers): I can't answer that yet. We have enough to. Definitely. Obviously. we have a search warrant for your home. But are we going to? No I can't answer that question. And I don't want to lie to you so I am not going to.

TS (Defendant): I am just I am just trying to think about what is in my best interest.

. . .

TR: Well, are you.. all what it comes down to is are you a witness or a suspect? So you know maybe that's where is come into play where you think about that and is it in is it in your best interest to help us? Because are you a witness? Or are you a suspect in this crime? Because when we knocked on your door you were a suspect. But right now to me it sounds like you're more like a witness. But you know that is not my choice to make. That is yours to make. You know what I mean? Like I said we are just sitting here having a conversation. You don't have to talk to me if you don't want to. You can tell me to go away.

TS: No I am just asking you what's in my best interest.

TR: right, and I can't answer that for you

TS: [Unintelligible] where I don't get in any trouble at school.

TR: right, I mean I definitely think at this point we can't. The school is going to do whatever is in the policy of the school to do.

10

Id., ¶ 36, Ex. B at 51; Ex. D at 01:00:50-01:02:15

Towards the end of the interview, SA Rogers repeated that the FBI was not charging defendant with any crimes that day and was not removing him from campus or arresting him.  Id., ¶ 37; Ex. B at 51-52; Ex. D at 01:02:25-01:02:32.

Defendant stated that Hudson had created and emailed to defendant the screen shots of nude photos and sexually explicit messages from victim J.S.'s email account.  Id., ¶ 33; Ex. B at 42; Ex. D at 50:15-50:20.  Defendant agreed to show SA Clapp and SA Rogers the screen shots allegedly emailed to him by Hudson. Id., ¶ 33; Ex. B at 43; Ex. D at 51:09-51:25.  SA Clapp said to defendant that if defendant would like to share information from his e-mail account with the agents, the agents would be willing to let him log into his e-mail account.  Defendant agreed to log into his e-mail account.  Id., ¶ 34; Ex. B at 46; Ex. D at 55:15-55:40.

Defendant informed the agents that he had school work on his laptop computer which was due that day.  SA Rogers and SA Clapp agreed to let defendant copy his school work onto his own flash drive so he could print it from the school computer. Id., ¶ 35; Ex. B at 46-47; Ex. D at 55:50-56:30.  SA Rogers and Clapp accompanied defendant back to his dorm room and allowed defendant to use his computer to save his school work onto a flash drive.  Defendant also logged into his computer to show the screenshots allegedly sent by Hudson.  Id., ¶ 38. Defendant additionally signed a consent form to allow the FBI to access defendant's "stankylaggg@gmail.com" and "ubpoerisascam@yahoo.com" accounts for further investigation.  Id.

The interview ended at approximately 8:31 a.m. Eastern Standard Time. After the interview was completed, the agents left defendant's residence.  A Trinity College official generally asked the agents how the search was going.  SA Rogers and SA Clapp informed the Trinity College official that defendant had been cooperative, but that the FBI did not know at the time whether defendant had been

honest during the interview.  The FBI agents did not discuss any details about the investigation, search or the interviews with the school officials.  Id., ¶ 39.

Throughout the search and interview, based on SA Rogers and SA Clapp's observations, defendant appeared to be cooperative and comfortable.  Id., ¶ 41. Defendant did not appear to be mentally impaired in any way.  Defendant did not appear to have any problems responding to the agents questions.  Defendant did not appear to be tired and did not complain about being hungry or thirsty.  Id.

During defendant's interview with the FBI, there were no other students nearby or in the hallway.  There were no Trinity College officials nearby.  The only persons present during defendant's interview were SA Rogers, SA Clapp, and one agent who briefly interrupted to bring water to defendant.  Id., ¶ 42.

**E.**   **Search of Defendant's Digital Devices Reveals He Lied to Agents During His Interview**

During the search of defendant's residence, the New Haven FBI agents seized, among other things, defendant's laptop computer and cell phone pursuant to the search warrant.  On January 26, 2011, SA Clapp obtained a warrant from the Honorable Victor B. Kenton authorizing the search of defendant's digital devices. Id., ¶ 43.  Pursuant to this search warrant, SA Rogers and SA Clapp retrieved numerous text messages from defendant's cell phone, including the following:

a.   On November 5, 2012, defendant sent a text to co-defendant Hudson: "We have been doing this for a while this is the big payday we've been waiting for set us up so we can play some real shit"

b.   On November 2, 2012, defendant sent a text to another individual, Elise Latham: "I feel hella good extorting [victim A.L.] for profit"

c.   On October 22, 2010, defendant sent a text to another student at Trinity College, John Lehrkind ("Lehrkind"): "just pic of 100 k from [victim J.S.] and we can split it"

d.   On November 9, 2010, defendant sent a text to Lehrkind in an

exchange regarding Spring Break vacation plans: "If [victim D.N.] works out I'm getting a 5k place for a week"

Id., ¶ 44.

## III.  ARGUMENT

### A.    Defendant Was Not In Custody During His Interview

Defendant's statements should not be suppressed because defendant was not in custody and his statements were voluntary.  As an initial matter, SA Rogers was not required to advise defendant of his Miranda rights because defendant was not in custody.  "Custody" under Miranda has been "narrowly circumscribed." Minnesota v. Murphy, 465 U.S. 420, 430 (1984).  To determine whether a person is in custody, a court "must determine whether 'the officers established a setting from which a reasonable person would believe that he or she was not free to leave.'" United States v. Kim, 292 F.3d 969, 973-974 (9th Cir. 2002) (citing United States v. Beraun–Panez, 812 F.2d 578, 580 (9th Cir.), modified by 830 F.2d 127 (9th Cir.1987)).  Courts examine a number of factors to determine whether or not defendant was subjected to the functional equivalent of an arrest, including: (1) the degree of pressure applied to detain the individual; (2) the extent to which the defendant [was] confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the language used to summon the individual.  United States v. Hayden, 260 F.3d 1062, 1066 (9th Cir. 2001).

In this case, a reasonable person in defendant's position would have believed that he could freely walk away from the FBI agent.  After the FBI completed a protective sweep of defendant's residence, SA Rogers asked to speak with defendant.  Rogers Decl., ¶ 15.  To underscore the fact that defendant was not in custody, before starting the interview, SA Rogers explicitly told defendant that he was not in custody and the FBI did not intend to arrest him.  She explained that the

13

1  FBI was searching defendant's property, that she would like to speak with

2  defendant, but he could leave and did not have to talk to the FBI if he did not want

3  to. Id., ¶ 17; Ex. B at 1-2; Ex. D at 1:21-2:10.  In fact, SA Rogers told defendant

4  more than once that he did not have to talk to the FBI. Id., ¶¶ 18, 36 ("You don't

5  have to talk to me if you don't want to.  You can tell me to go away.").  SA Rogers

6  and SA Clapp maintained a friendly and casual tone throughout the interview. Id.,

7  ¶ 40; see United States v. Bassignani, 575 F.3d 879, 884 (9th Cir. 2009) (agents'

8  use of "open, friendly tone" in questioning defendant contributed to finding that

9  defendant was not in custody).  The agents were not in uniform or visibly armed,

10  and did not handcuff defendant.  At no point did SA Rogers tell defendant that he

11  would have to agree to the interview to avoid being expelled from Trinity College.

12  At no point did SA Rogers demand that defendant speak with the FBI or tell

13  defendant he was going to jail. Rogers Decl., ¶ 18.  Defendant appeared to

14  understand the agent's advisement and did not indicate he had any questions. Id.,

15  ¶ 17.  At the end of the interview, SA Rogers reiterated that defendant would not be

16  arrested and that defendant "can tell [the agent] to go away." Id., ¶ 37; Ex. B at 51-

17  52.

18       SA Roger's statements and actions would have indicated to a reasonable

19  person in defendant's position that he was in control and was free to either stay and

20  speak to the agents, or leave and terminate the interview. See Bassignani, 575 F.3d

21  at 886 ("We have consistently held that a defendant is not in custody when officers

22  tell him that he is not under arrest and is free to leave at any time.").  Thus, SA

23  Rogers was not required to inform defendant of his Miranda rights because

24  defendant was not in custody. Miranda v. Arizona, 384 U.S. 436, 478-479 (1966).

25  **B.    Defendant's Statements Were Voluntary And Therefore Should Not Be Suppressed**

26       "Before a criminal defendant's statement can be used against him, the

27  government must prove its voluntariness by a preponderance of the evidence."

28

14

1  United States v. Leon Guerrero, 847 F.2d 1363, 1365 (9th Cir. 1988) (citing Lego

2  v. Twomey, 404 U.S. 477, 489 (1972)).  "A confession is involuntary if coerced

3  either by physical intimidation or psychological pressure."  United States v.

4  Haswood, 350 F.3d 1024, 1027 (9th Cir. 2003).  In determining whether a

5  defendant's confession was voluntary, "the question is whether the defendant's will

6  was overborne at the time he confessed."  Clark v. Murphy, 331 F.3d 1062, 1072

7  (9th Cir. 2003).  Defendant essentially argues in his motion that he was

8  psychologically coerced into speaking with FBI Special Agents Rogers and Clapp

9  because he allegedly believed that he would be expelled from Trinity College if he

10  declined to do so.  Def. Mtn. at 4-5.  In cases where psychological coercion is

11  alleged, the court "must consider the totality of the circumstances involved and

12  their effect upon the will of the defendant."  United States v. Miller, 984 F.2d 1028,

13  1031 (9th Cir. 1983) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226-227

14  (1973)).  Some of the circumstances to consider are "police coercion, . . . the length

15  of the interrogation, its location, and its continuity," as well as "the failure of the

16  police to advise the suspect of his rights" and "any direct or implied promises of a

17  benefit."  Clark, 331 F.3d at 1072 (citations omitted).  As the Ninth Circuit has

18  noted, coercion typically involves "outrageous conduct."  Haswood, 350 F.3d at

19  1028.

20          1.     There Was No Psychological Coercion Because There Was No
                   Express Or Implied Threat That Defendant Would be Expelled from
21                 Trinity College If He Refused To Answer the FBI's Questions

22          In this case, defendant does not – and cannot – allege that he was subjected

23  to any physical intimidation.  Defendant's claim of psychological coercion based

24  upon alleged implied threats of being expelled by Trinity College also fails.  The

25  Supreme Court has clearly stated that "the general obligation to appear and answer

26  questions truthfully [does] not in itself convert . . . otherwise voluntary statements

27  into compelled ones."  Murphy, 465 U.S. at 427.  Despite receiving Miranda

28  warnings and orally waiving his rights, defendant argues that he was explicitly and

15

implicitly threatened when he was interviewed in the hallway of his dormitory "with an Associate Dean of the college looking on." Def. Mtn. at 4. Defendant claims that the alleged presence of the Associate Dean gave defendant the purported belief that "he had no real choice but to agree to the FBI interrogation if he wanted to remain a student at Trinity College." Def. Mtn. 5. To the contrary, defendant received no such threats, either explicitly or implicitly.

As an initial matter, defendant's argument is premised on facts that are not accurate. It is not true that defendant was subjected to an interrogation in the hallway "where other curious students could observe the spectacle." Def. Mtn. at 4. Instead, the interview took place on the landing of the stairwell, which was separated by a door, at the end of defendant's hallway. Rogers Decl., ¶ 16. As SA Rogers explained, based on her training and experience in conducting interviews, she generally makes an effort to conduct interviews wherever the witness feels the most comfortable and would have privacy, unless that area is unavailable. Id., ¶ 15. At the time of defendant's interview, agents were in the process of searching defendant's bedroom. SA Rogers therefore made a diligent, conscious effort to interview defendant in a private space created by the landing of a stairwell with a separate door, away from other students and school officials. Id., Ex. C. SA Rogers additionally told defendant that they could go back into his bedroom after the agents have completed the search. Id., ¶ 15, Ex. B at 1, Ex. D at 0:00-1:15.

Defendant's contention that private rooms were available for the interview is also incorrect. There were no private rooms on the floor that were made available to the FBI by Trinity College in which to conduct the interviews. Id., ¶ 16.

It is also not true that the Associate Dean was present during the interview and added to the coercion. The only persons present during defendant's interview were defendant himself, SA Rogers, SA Clapp, and one FBI agent who briefly interrupted to bring water to defendant. Id., ¶ 41. Moreover, agents were stationed at the top and bottom of each stairwell to ensure no one would approach or

16

interrupt the interview.  Id., ¶ 16.  There were, in fact, no other students or Trinity College officials nearby during defendant's interview.

Defendant's claimed belief that "the college wouldn't expel him if he played ball and became a witness against himself" is also without basis.  Def. Mtn. At 6. During the interview, when defendant stated that he did not want to get in trouble with the school, SA Clapp responded that the decision would be up to the school. SA Clapp further stated that the FBI could tell the school that defendant was being cooperative (and in fact, the agents did so), but they did not have the final say as to the school's decisions concerning defendant.  Rogers Decl., ¶ 28, Ex. B at 32; Ex. D at 38:07-38:28.

When defendant asked whether the FBI intended to press charges against him, SA Rogers responded as follows:

> TR (SA Rogers):  I can't answer that yet.  We have enough to.  Definitely. Obviously. we have a search warrant for your home.  But are we going to? No I can't answer that question.  And I don't want to lie to you so I am not going to.
>
> TS (Defendant):  I am just I am just trying to think about what is in my best interest.
>
> . . .
>
> TR: Well, are you.. all what it comes down to is are you a witness or a suspect?  So you know maybe that's where is come into play where you think about that and is it in is it in your best interest to help us?  Because are you a witness?  Or are you a suspect in this crime?  Because when we knocked on your door you were a suspect.  But right now to me it sounds like you're more like a witness.  But you know that is not my choice to make.  That is yours to make.  You know what I mean?  Like I said we are just sitting here having a conversation.  You don't have to talk to me if you don't want to. You can tell me to go away.
>
> TS:  No I am just asking you what's in my best interest.
>
> TR: right, and I can't answer that for you
>
> TS: [Unintelligible] where I don't get in any trouble at school.
>
> TR:  right, I mean I definitely think at this point we can't.  The school is going to do whatever is in the policy of the school to do.

Id., ¶ 36, Ex. B at 51; Ex. D at 01:00:50-01:02:15 (emphasis added).

Nothing in this exchange reflects any express or implied threat made to defendant.  When defendant asked what would be in his best interest, SA Rogers unequivocally stated she could not answer that question, as it was defendant's choice to make.  At no point did SA Rogers imply or encourage any belief that defendant could avoid being kicked out of school if he agreed to speak with the FBI.  Rather, SA Rogers repeated that defendant did not have to speak with her if he didn't want to; defendant could tell the agent to go away.  Id.  SA Rogers reiterated that the school would do whatever was within the school policy.  Id.  Indeed, SAs Rogers and Clapp's statements should have and would have made clear that defendant's decision to speak with the FBI had no bearing on any decision made by the college.

It is clear from the totality of the circumstances that defendant's will was not overborne.  As discussed above, defendant was interviewed in a private area, away from other students and school officials, by two agents wearing civilian clothing, and without any visible firearms.  The Associate Dean was not present during the interview.  SA Rogers repeatedly told defendant that he did not have to speak with her and was free to leave.  At no point did the FBI agents order or pressure defendant to agree to answer SA Roger's questions or to incriminate himself.

2.   SA Rogers Advised Defendant of His Miranda Rights

Even though defendant was not in custody, SA Rogers took extra precautions to make sure that defendant understood his privilege against self-incrimination by orally providing defendant Miranda warnings at the beginning of the recorded interview.  See Rogers Decl., ¶ 17; Ex. B at 1-2; Ex. D at 1:21-2:10.  Defendant's challenge with respect to the voluntariness of his statements after orally waiving his Miranda rights is without merit.

After SA Rogers advised defendant of his Miranda rights, the agent observed that defendant appeared to have understood the advisement and did not indicate he had any questions.  See Rogers Decl., ¶ 17; Ex. B at 1-2; Ex. D at 1:21-2:10.  In

fact, defendant had stated "ok" three times, indicating that he understood the agent's advisement.  See Rogers Decl., ¶ 17; Ex. B at 1-2; Ex. D at 1:21-2:10. Defendant did not express any concerns or ask any follow-up questions about his Miranda rights that would have suggested that defendant was confused in any way. Id.  Having received Miranda advisement, defendant agreed to speaking with the agent without requesting an attorney.  Id.  SA Rogers' diligent efforts to make sure defendant was aware of his constitutional rights is a factor that supports the voluntariness of defendant's statements.

> 3.    The Remaining Factors And Totality Of The Circumstances Demonstrate That Defendant's Statements Were Voluntary

The remaining voluntariness factors enumerated in Clark also support the voluntariness of defendant's statements.  Any contention that defendant's waiver was involuntary is flatly contradicted by the evidence in this case.

As an initial matter, defendant's claim that he was held in the living room in his underwear for 30 minutes to an hour while agents ransacked his bedroom, and was eventually allowed to "put on a pair of short pants" while remaining shirtless is simply untrue.  Indeed, a photograph taken by SA Pappalardo, as part of the "entry" photos, depicts defendant sitting in his living room wearing a hooded sweatshirt and jeans approximately 15 to 20 minutes after agents entered defendant's residence.  See Pappalardo Decl., ¶ 7, Ex. D.   Additionally, the entry photographs depicting the condition of defendant's bedroom prior to the search shows the original state of the bedroom, including his unmade bed.  See Pappalardo Decl., ¶ 6, Ex. C.  The "exit" photographs depicting the condition of defendant's bedroom after the search clearly shows that the agents did not ransack the room, and did not tear defendant's bed apart.  See Pappalardo Decl., ¶ 7, Ex. D.

Defendant's interview lasted approximately one hour, from approximately 7:23 a.m. to 8:31 a.m., not several hours as defendant claims, and a far cry from lengthier interrogations that courts have previously held to be uncoercive.  See,

e.g., Clark, 331 F.3d at 1073 (several interviews over an eight-hour detention not coercive); Jenner v. Smith, 982 F.2d 329 (8th Cir. 1993) (six- or seven-hour questioning not coercive); Martin v. Wainwright, 770 F.2d 918 (11th Cir. 1985) (five-hour intermittent questioning did not render confession involuntary).

Furthermore, as discussed above, the interview took place on the landing of the stairwell at the end of defendant's hallway, not in the middle of the hallway, as defendant claims. Rogers Decl., ¶ 16. There were no students or school officials nearby, and the FBI took measures to make sure that no one would approach or interrupt defendant's interview.

As evident in the recorded interview, SA Roger and SA Clapp used a friendly and conversational tone throughout the interview. Rogers Decl., Ex. D. Both agents wore business suits, kept their weapons concealed, and did not handcuff defendant. Rogers Decl., ¶ 40. Defendant appeared cooperative and comfortable during the interview, and even accepted a glass of water from an agent. Id. At no point did defendant appear to be ill or tired. Id. Under the totality of the circumstances in this case, it is clear that the statements defendant made to SA Rogers were voluntary. Thus, defendant's statements should not be suppressed.

**C.   Even If The Court Finds That Defendant Was In Custody During The Interview, Defendant's Statements Should Not Be Suppressed Because Defendant Waived His Miranda Rights**

Under Miranda v. Arizona, 384 U.S. 436 (1966), a person subject to custodial interrogation has the right to be informed that he has the right to remain silent, the right to the presence of an attorney, and, if he cannot afford an attorney, the right to have an attorney appointed prior to questioning if he wishes. There is no dispute that SA Rogers properly informed defendant of his Miranda rights before beginning the interview. See Rogers Decl., ¶ 15; Def. Mtn. at 4. Although the government does not believe defendant was in custody during his brief interview, if the Court disagrees, it should nevertheless deny defendant's motion to

20

suppress his statements because defendant was properly <u>Mirandized</u> and waived his <u>Miranda</u> rights prior to questioning.

An inculpatory statement made by defendant after waiving his <u>Miranda</u> rights is admissible only when the waiver is "voluntary, knowing, and intelligent." <u>United States v. Shi</u>, 525 F.3d 709, 727 (9th Cir. 2008) (quoting <u>United States v. Garibay</u>, 143 F.3d 534, 536 (9th Cir. 1988)).  The validity of a <u>Miranda</u> waiver depends on the "totality of the circumstances including the background, experience, and conduct of defendant." <u>Id.</u>; <u>see</u> <u>also</u> <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986); <u>Oregon v. Bradshaw</u>, 462 U.S. 1039, 1045 (1983); <u>United States v. Labrada-Bustamante</u>, 428 F.3d 1252, 1259 (9th Cir. 2005) (holding that a waiver was valid based on totality of circumstances including defendant's admission that he understood his rights and the fact that no threats or promises were made to defendant); <u>United States v. Frank</u>, 956 F.2d 872, 877 (9th Cir. 1991) (holding that defendant's confession was voluntary and admissible even though government experts testified at competency hearing that defendant had "limited understanding"; there was no evidence that defendant was intimidated, coerced, or deceived).  To prove a valid waiver, the government must show that (1) the waiver represented a "free and deliberate choice" and (2) the defendant understood both the nature of the right being waived and the consequences of waiver.  <u>Moran</u>, 475 U.S. at 421.

Under the totality of the circumstances in this case, defendant's <u>Miranda</u> waiver was knowing, voluntary, and intelligent.  Defendant acknowledged that he understood his rights by repeatedly stating "ok" when SA Rogers orally advised him of his rights.  Furthermore, defendant did not mention any concerns or ask follow-up questions regarding his rights.

For the same reasons explained above, defendant was not psychologically coerced into waiving his <u>Miranda</u> rights because he did not receive any express or implied threats that he would be expelled from Trinity College.  Therefore, his <u>Miranda</u> waiver was voluntary and the Court should deny defendant's motion to

21

suppress his statements.

**D.     Defendant's Motion to Dismiss Count 15 Should be Denied**

Defendant's argument that Count 15 of the indictment, which charges a violation of 18 U.S.C. § 1001(a)(2), making a false statement to law enforcement, should be dismissed as it was based on defendant's unlawful confession is without merit.  As discussed above, in light of the totality of the circumstances surrounding defendant's interview, there is no evidence of coercion to warrant suppression of defendant's statements.  Accordingly, defendant's motion should be denied.

## IV.  CONCLUSION

For all the foregoing reasons, defendant's motion to suppress statements and to dismiss Count 15 should be denied in its entirety.

Dated: March 30, 2012                    Respectfully submitted,

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division


 /s/
WENDY T. WU
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

22